IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 11, 2003

## STATE OF TENNESSEE v. ABEL CABERRA TORRES

**Appeal from the Circuit Court for Warren County**
**No. F-8032     Charles D. Haston, Judge**

---

**No. M2001-01412-CCA-R3-CD - Filed June 10, 2003**

---

The defendant, Abel Caberra Torres, was convicted of attempted especially aggravated robbery, two counts of attempted second degree murder, aggravated assault, and attempted aggravated assault. The trial court merged the last two offenses into the attempted second degree murder convictions and ordered consecutive sentences of twelve years for each offense, for an effective sentence of thirty-six years. In this appeal of right, the defendant asserts (1) that the evidence was not sufficient; (2) that the trial court erred by failing to suppress his statements to police; (3) that the trial court erred in its instructions to the jury; and (4) that the sentence was excessive. The judgments of conviction are affirmed. Because of the misapplication of enhancement factors, each of the sentences are modified to ten years. The cause is remanded to the trial court for further findings on the consecutive sentencing issue.

**Tenn. R. App. P. 3; Judgments of the Trial Court Affirmed in Part, Reversed in Part, and Remanded in Part**

GARY R. WADE, P.J., delivered the opinion of the court, in which JOE G. RILEY and ALAN E. GLENN, JJ., joined.

Dan T. Bryant, District Public Defender (on appeal and at trial); and Robert Boyd and Scott Grissom, Assistant District Public Defenders (at trial), for the appellant, Abel Caberra Torres.

Paul G. Summers, Attorney General & Reporter; Brent C. Cherry, Assistant Attorney General; and Dale Potter, District Attorney General, for the appellee, State of Tennessee.

### OPINION

On September 14, 1999, Angela McCormick, the victim of the attempted robbery and one of the attempted second degree murders, was the clerk on duty at the Pit Stop North convenience market in McMinnville. At 9:00 p.m., she closed the store, locked the doors, and walked to her car. After starting her car and turning on the headlights, the victim observed an individual standing on an embankment behind the store. He was black, wore a white shirt, and held a long gun at his side.

As she attempted to drive away, her car "died" and the perpetrator fired a shot into her car. Bullet fragments struck her shoulder and a finger. Unable to re-start her car, the victim left her vehicle and ran towards a truck where Tim Young was using a pay telephone. Young drove the victim away from the market and located a police officer. After she was taken to the hospital, doctors removed the bullet fragment from the victim's shoulder. Later, additional surgery was required to remove the fragment from her finger. Pieces of glass from the windshield were embedded in her head. Ms. McCormick described her assailant as "kind of a bigger person," but was unable to make an identification.

While preparing to use the pay telephone, Young had seen a "figure" on an embankment at the edge of the parking lot tracking the victim's movements to her car. He had observed the victim enter her car before the assailant filed a large caliber rifle that sounded as though the "whole parking lot [had] exploded." When he saw the victim emerge from her car, fall, and run towards his truck, Young heard her say that she had been shot in the head and needed his help. As she got in the truck, the perpetrator fired a second shot in their direction and, as Young drove away, he heard a third shot. Young then saw a police cruiser in traffic and obtained assistance for the victim. Young, the victim of the second attempted second degree murder charge, was unable to identify the shooter.

McMinnville Police Department Detective Marty Cantrell, who investigated the crimes, observed bullet damage to the victim's car and to a short brick wall bordering the parking lot. He collected an unfired round found behind the wall, as well as casings from two spent 7.62 x 39mm rounds of ammunition. A summary of his testimony at trial is as follows:[1]

> Detective Cantrell . . . testified that he had received information that . . . Hernaldo Caberra . . . at Westside Apartments had threatened some individuals. [He] . . . went to . . . 103A Westside Apartments and inquired about [Caberra]. Jessica, [Caberra's] girlfriend, stated that [Caberra] was in the bed, but gave Detective . . . Cantrell consent to search the apartment. While doing so, a 7.62x39mm unfired cartridge was found. [The detective] then cleared the apartment of the four (4) individuals who were there. [He] testified that upon finding the cartridge, [the defendant] stated "that's mine". . . . [Detective Cantrell] then mirandized [the sixteen-year-old defendant], but never called a parent . . . . [The defendant] . . . directed [him] to where the weapon had been acquired through contact with T.J. Horn.

At trial, Detective Cantrell provided an audiotaped statement and a signed, handwritten statement by the defendant confessing to the crimes. Neither of the statements are in the record.

Detective Barry Powers, who was present when Detective Cantrell interviewed the defendant,

---

[1]Because the audiotape recording of his direct testimony was lost prior to transcription, it does not appear in the record. Pursuant to Tennessee Rule of Appellate Procedure 24(c), the parties submitted a statement of the evidence he provided at trial.

testified that the defendant "appeared to be indifferent, and at times even proud of what he had done." While initially suspecting that the defendant's brother had committed the crimes, Detective Powers recalled that the defendant admitted firing shots at both the victim and Young, explaining that his mask had fallen and he was afraid that they would be able to identify him.

Caberra Torres, the defendant's eighteen-year-old brother, testified that he overheard a third brother, Hernaldo Caberra, tell their mother that he was going to testify that he had committed the shooting. It was his opinion that Caberra was a bad influence on the defendant.

The statement of the evidence included a summary of the testimony of three defense witnesses whose audiotaped testimony was lost:

> Ms. Elizabeth Diaz, an employee of Department of Children's Services, . . . stated she was called to act as an interpreter, and that while at Warren County Jail, she overheard the [d]efendant . . . speaking in Spanish with his brother, [c]o-[d]efendant Hernaldo Caberra. Ms. Diaz testified that she recalled hearing . . . [Hernaldo] Caberra telling his younger brother to take the blame.
>
> Hernaldo Caberra[,] . . . through an interpreter, . . . admitted being the older brother of the [d]efendant; admitted living in various locations, including Puerto Rico; admitted having been charged and convicted of [b]urglary and [t]heft for stealing computers from a school in Puerto Rico[;] and admitted being on the scene of the alleged attempted robbery. He denied carrying the weapon to the scene . . . . When asked if he had fired the weapon, after consulting with his attorney, he [i]nvoked his [F]ifth [A]mendment privilege against self-incrimination to this question and all others.
>
> *     *     *
>
> Ms. Haomi Torres, defendant's mother testified that her son, Hernaldo Caberra, had intended to take the blame for the shooting.

The defendant, who was born in Puerto Rico, had lived with his family in Warren County for eight or nine years. When he was in the sixth grade, he returned to Puerto Rico with his mother and siblings in order to provide care for a relative there. Two years later, in the winter of 1999, the defendant and his brothers returned to Warren County, where he obtained employment at U.S.A. Auto Sales. His father also worked there. By the summer of 1999, his half-brother, Hernaldo Caberra, had moved into the residence the defendant shared with his parents. The defendant contended that the gun used in the shooting belonged to Caberra and, with twenty rounds of ammunition, had been purchased on credit from a friend named "T.J."

At trial, the defendant testified that at approximately 5:00 on the afternoon of the shooting, he and Caberra went to an apartment shared by "Jessica and Melissa." After one of the girls said that she needed money, the defendant suggested that they rob a gas station. He claimed that Caberra retrieved the gun, which was stored in a dumpster near the apartments. While the defendant

acknowledged that he had carried the gun to the convenience market, he claimed that he had done so pursuant to his older brother's instructions. He contended that Hernaldo Caberra, who was dressed in a white t-shirt and blue jeans, loaded the gun, ran towards the victim, and ordered her to "give [him] the money." The defendant insisted that Caberra fired at the woman and then fired a second shot. He testified that his older brother arrived at the apartment complex only seconds after he did and then handed him the gun. The defendant acknowledged that he disposed of the weapon in some bushes nearby. He contended that Caberra asked him to "take the blame" for the shooting because he was younger and "wouldn't get in trouble." The defendant maintained that his older half-brother coached him on the details of the crimes. He insisted that his confession to police was not true.

The defendant conceded that he claimed to police that the unspent cartridges were his, explaining that he had done so because Jessica, Melissa, and Caberra gave an instruction in Spanish for him to do so. He agreed that he led police to where the gun was hidden in the bushes and admitted being responsible for the shooting. During cross-examination, the defendant stated that he decided to recant his confession when he realized that he was "going to jail for something that [he] didn't do."

I

Initially, the defendant argues that the evidence was insufficient to support his convictions for the attempted especially aggravated robbery of Angela McCormick and the attempted second degree murder of Tim Young. He argues that there is no evidence that Ms. McCormick suffered the requisite "serious bodily injury" or that any of the shooting was directed toward Young. The defendant does not challenge the sufficiency of the evidence for the attempted second degree murder of Ms. McCormick.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A robbery becomes

especially aggravated when it is accomplished with a deadly weapon and the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a). "Serious bodily injury" is defined as bodily injury which involves a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. Tenn. Code Ann. § 39-11-106(a)(34). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3).

Angela McCormick testified that she sustained bullet wounds to her shoulder and her right index finger as a result of the shooting. The bullet fragment that entered her shoulder had to be surgically removed. Ms. McCormick was hospitalized overnight for her injuries. Although her finger was swollen, doctors did not discover until later, when an x-ray was performed, that a bullet fragment had lodged there. Surgery was required to remove the fragment from the finger. In our view, the evidence was sufficient for a reasonable jury to find that the Ms. McCormick suffered "serious bodily injury." See State v. Richard T. Smiley, No. 03C01-9707-CR-00305 (Tenn. Crim. App., at Knoxville, Oct. 6, 1998) (holding that evidence was sufficient to support a finding of "serious bodily injury" where injury to victim's finger severed an artery and required surgery to repair).

Second degree murder is a "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]" Tenn. Code Ann. § 39-11-106(a)(20). Tim Young testified that two shots were fired in his direction – one as the victim started for his truck and another as he attempted to drive from the convenience market parking lot. When the defendant confessed to police, he stated that he had fired upon both the victim and Young and that he had done so out of fear that they would be able to identify him. At trial, he attributed those same motives to his older half-brother, claiming that Hernaldo Caberra was the assailant. In our view, the evidence was sufficient to support a finding that the defendant attempted a knowing killing of Tim Young.

II

Next, the defendant asserts that the trial court erred by failing to suppress his pre-trial statements to police. Prior to trial, the defendant filed a motion seeking suppression on the grounds that the statements were involuntary. Because the court reporter was unable to locate the audiotapes of the hearing conducted by the trial court, no transcript has been included in the record. Nor does the record contain any of the defendant's pre-trial statements. The state asserts that the record is inadequate for review and the defendant has, therefore, waived the issue.

Initially, it is unfortunate that audiotapes of certain of the pre-trial and trial proceedings were lost. Nevertheless, the Tennessee Rules of Appellate Procedure provide a specific procedure for

submission of the record under such circumstances:

> Statement of the Evidence When No Report, Recital, or Transcript Is Available. If no stenographic report, substantially verbatim recital or transcript of the evidence or proceedings is available, the appellant shall prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement should convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal. The statement, certified by the appellant or the appellant's counsel as an accurate account of the proceedings, shall be filed with the clerk of the trial court within 90 days after filing the notice of appeal. Upon filing the statement, the appellant shall simultaneously serve notice of the filing on the appellee, accompanied by a short and plain declaration of the issues the appellant intends to present on appeal. Proof of service shall be filed with the clerk of the trial court with the filing of the statement. If the appellee has objections to the statement as filed, the appellee shall file objections thereto with the clerk of the trial court within fifteen days after service of the declaration and notice of the filing of the statement. Any differences regarding the statement shall be settled as set forth in subdivision (e) of this rule.

Tenn. R. App. P. 24(c). The state correctly argues that although a transcript of the suppression hearing was not available, an account of the proceeding could have been submitted in the form of a Rule 24(c) statement of the evidence. It is always the duty of the appellant, in this case the defendant, to submit such a statement. See Tenn. R. App. P. 24(b) – (c).

In addition to the various omissions in the record, the defendant has failed to cite any authority for his position or to provide this court with any more than general allegations that his statement was involuntary. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7); State v. Hammons, 737 S.W.2d 549, 552 (Tenn. Crim. App. 1987). Under these circumstances, this court must conclude that the claim is waived.

III

Next, the defendant contends that the trial court erroneously instructed the jury on the term "knowing" in the context of the attempted second degree murder charges. Specifically, he contends that the trial court's instructions lessened the state's burden of proof.

The trial court instructed the jury on the attempted second degree murder of Angela McCormick as follows:

> The [s]tate must prove that the defendant intended to commit the specific offense of second degree murder, and the defendant did some act . . . constitut[ing] a substantial step towards the commission of second degree murder. . . . Here are the essential elements of the crime of second degree murder itself. One, that the

-6-

defendant unlawfully did kill the alleged victim Angela McCormick, and that the defendant acted knowingly. . . . Knowingly means that a person acts knowingly with respect to the conduct or the circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

The instructions as to the attempted second degree murder of Tim Young were essentially the same.

The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see also Tenn. R. Crim. P. 30. "[The] defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Our law requires that all of the elements of each offense be described and defined in connection with that offense. See State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). Jury instructions must, however, be reviewed in the context of the overall charge rather than in isolation. See Sandstrom v. Montana, 442 U.S. 510 (1979); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

Initially, the defendant failed to present this issue in his motion for new trial. Generally, the failure to present an issue in a motion for new trial results in waiver. Rule 3(e) of the Tennessee Rules of Appellate Procedure provides that for appeals "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." See also State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial). Whether properly assigned or not, however, this court may consider plain error upon the record under Rule 52(b) of the Tennessee Rules of Criminal Procedure. State v. Ogle, 666 S.W.2d 58 (Tenn. 1984).

Before an error may be so recognized, it must be "plain" and must affect a "substantial right" of the accused. The word "plain" is synonymous with "clear" or equivalently "obvious." United States v. Olano, 507 U.S. 725, 732 (1993). Plain error is not merely error that is conspicuous, but especially egregious error that strikes at the fairness, integrity, or public reputation of judicial proceedings. See State v. Wooden, 658 S.W.2d 553, 559 (Tenn. Crim. App. 1983). In State v. Adkisson, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994), this court defined "substantial right" as a right of "fundamental proportions in the indictment process, a right to the proof of every element of the offense and . . . constitutional in nature." In that case, this court established five factors to be applied in determining whether an error is plain:

(a) The record must clearly establish what occurred in the trial court;

(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused [must not have waived] the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice."

Id. at 641-42. Our supreme court characterized the Adkisson test as a "clear and meaningful standard" and emphasized that each of the five factors must be present before an error qualifies as plain error. State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000). An error in jury instructions on the conduct element of an offense will be plain when it cannot be classified as harmless beyond a reasonable doubt. Cf. State v. Ben Mills, No. W1999-01175-CCA-R3-CD (Tenn. Crim. App., at Jackson, May 3, 2002) (erroneous failure to provide jury instructions on lesser included offenses did not qualify as plain error where the error could be classified as harmless beyond a reasonable doubt); see also State v. Page, 81 S.W.3d 781, 789 (Tenn. Crim. App. 2002).

In State v. Page, this court held that second degree murder is a result-of-conduct offense. In charging the indicted offense of second degree murder, the trial court in Page instructed the jury that a person acts knowingly if he acts with an awareness "(1) that his conduct is of a particular nature; or (2) that a particular circumstance exists; or (3) that the conduct was reasonably certain to cause the result." 81 S.W.3d at 786. This court held that the instruction was error:

> [A] knowing second degree murder is strictly a "result-of-conduct" offense. . . . The result of the conduct is the only conduct element of the offense; the "nature of the conduct" that causes death is inconsequential.
>
> *       *       *
>
> A jury instruction that allows a jury to convict on second degree murder based only upon awareness of the nature of the conduct or circumstances surrounding the conduct improperly lessens the state's burden of proof. For second degree murder, a defendant must be aware that his or her conduct is reasonably certain to cause death. . . .

Id. at 787-88. This court further determined that because the defendant's mens rea was the issue at trial, the error was not harmless beyond a reasonable doubt and required reversal. Our opinion, however, also observed that

> in many, if not most, homicide trials, the mens rea jury instructions utilized in this case would be harmless error. If a victim is shot at point blank range with a twelve gauge shotgun while asleep, and the defense is the defendant was not the shooter, then the erroneous instruction would likely be harmless.

Id. at 789.

In State v. Allen Lee Dotson, Sr., No. M2001-01970-CCA-R3-CD (Tenn. Crim. App., at Nashville, Oct. 21, 2002), the defendant was convicted of second degree murder on a jury charge that

omitted entirely the result-of-conduct element in the definition of knowingly. On appeal, this court held that the omission was error, but determined that it was harmless beyond a reasonable doubt:

> We conclude the instant facts are distinguishable from <u>Page</u>, in that the defendant did not deny the intentional killing of the victim and the [s]tate focused, and its proof showed, that the defendant fired a shotgun at close range into the head of an unarmed victim who was lying on the ground. The defendant's conduct and defenses did not call into question whether the defendant's conduct was likely to produce death. The [s]tate is therefore correct, and they have proven the error was harmless beyond a reasonable doubt.

<u>Allen Lee Dotson, Sr.</u>, No. M2001-01970-CCA-R3-CD, slip op. at 5.

Finally, in <u>State v. Tony Martin</u>, No. W2001-02221-CCA-R3-CD (Tenn. Crim. App., at Jackson, Feb. 7, 2003), a panel of this court held that the trial court's instructions on the knowing element of second degree murder, which were similar to those given in this case, were erroneous. Reversal was not required, however, because the error was determined to be harmless beyond a reasonable doubt:

> The primary dispute in this trial was whether the defendant fired his gun at the victim first or was fired upon first, prompting him to wield his gun in self-defense. It is undisputed that the defendant had a handgun, pulled it out, and that the gun was fired and caused the death of the victim. It belies common sense to believe that, if the defendant did indeed fire his gun first a close range, he was not aware that his conduct was reasonably certain to result in the death of the victim. There was ample evidence produced at trial . . . to allow a rational jury to find that the defendant did fire his weapon first. . . .

> Holding that a rational jury could have determined that the defendant fired his weapon first, we conclude the jury instruction, containing elements of knowing involving the nature and circumstances as well as the result of conduct element, was harmless beyond a reasonable doubt. Despite the nature and circumstances given in the definition, it is beyond a reasonable doubt that a rational jury could conclude that the defendant was aware the result of his conduct, the firing of the gun at close range resulting in the death of the victim, was reasonably certain.

<u>Tony Martin</u>, No. W2001-02221-CCA-R3-CD, slip op. at 10. In a separate concurrence, Judge Tipton wrote that "with the state relying upon an intentional assault and the defense focusing upon self-defense, I conclude the risk of the jury applying the wrong definition was minimal." In his view, the error, which had not been previously raised by the defendant, did not rise to the level of plain error.

Here, the trial court's instruction on the knowing element of attempted second degree murder

was error. The instruction erroneously included a "nature-of-conduct" component. See Page, 81 S.W.3d at 788 (suggesting that the jury be instructed that "'[k]nowingly' means that a person acts with an awareness that [his] [her] conduct is reasonably certain to cause the death of the alleged victim"). In our view, however, the error was harmless. The primary dispute in this trial was the identity of the perpetrator. The defendant's theory of defense was that he was not the shooter. It did not call into question whether the conduct at issue, firing an assault rifle at two unarmed victims, was likely to cause death. It is our view that the issue does not rise to the level of plain error.

IV

Finally, the defendant contends that the trial court erred by sentencing him to the twelve-year maximum on each count and by ordering that the three sentences be served consecutively.

Sharon Scott, a probation officer, completed the defendant's presentence report. At the hearing, she testified that the defendant, who had no prior record, "didn't refuse [to make a statement], but . . . just didn't choose to make one." He had been employed part-time at U.S. Auto Sales and Body Shop, but was unemployed at the time of the offenses. Ms. Scott related that the defendant began using alcohol at age twelve and marijuana, which he was smoking several times a day at the time of his arrest, at age fourteen; he had experimented with cocaine but denied being a frequent user. Ms. Scott had no information regarding any types of educational or rehabilitative programs in which the defendant may have participated while in confinement.

Detective Barry Powers, who had interviewed the defendant about the shooting, testified that the defendant appeared to have "no remorse of what he done. At times he would kind of smile about it. It just seemed like he didn't care." The detective recalled that he initially believed that Hernaldo Caberra had done the shooting, but changed his mind after the defendant provided "great detail" to police. He acknowledged that the defendant had been cooperative with investigating officers. Detective Marty Cantrell also testified that the defendant showed no remorse over the shooting: "[A]t one point I even asked him how he would have felt if one of these bullets would have actually killed somebody. He said, 'I would have felt the same. I wouldn't have cared.'" He recalled that the defendant told him that he had fired at Tim Young because he thought Young could identify him. According to Detective Cantrell, the SKS assault rifle used in the shooting had been reported stolen.

Angela McCormick testified that she continues to fear "be[ing] out after dark" and that she now works in a factory, having had to change jobs as a result of the shooting. She agreed that maximum sentences would be appropriate.

The defendant testified that since he has been in prison, he has been segregated from the main population and has not participated in any type of rehabilitative program. He stated that he had completed the eighth grade while attending school in the United States, but that he had dropped out after being placed back into the sixth grade when he returned to Puerto Rico. The defendant confirmed that he began drinking alcohol when he was twelve and using marijuana when he was fourteen. He estimated that he had used cocaine ten times, but denied having done so recently. The defendant explained that he suggested that they rob the convenience store after someone else had

suggested a bank robbery. He maintained that he did not know the gun purchased by him and Caberra had been stolen.

Although the trial court's oral pronouncement of the defendant's sentence is not entirely clear, the trial judge appears to have found no applicable mitigating factors. See Tenn. Code Ann. § 40-35-113. The trial court applied six enhancement factors: (1) that the defendant had a previous history of criminal behavior in addition to that necessary to establish the appropriate range; (2) that the defendant was a leader in the commission of an offense involving two or more criminal actors; (3) that the offense involved more than one victim; (9) that the defendant possessed or employed a firearm during the commission of the offense; (10) that the defendant had no hesitation about committing a crime when the risk to human life was high; and (16) that the crime was committed under circumstances under which the potential for bodily injury to a victim was great. See Tenn. Code Ann. § 40-35-114(1) – (3), (9) – (10), (16) (1997). After sentencing the defendant to twelve years on each of the three convictions, the trial court ordered consecutive sentencing, finding that the defendant was a dangerous offender whose behavior indicates no regard for human life and no hesitation about committing a crime in which the risk to human life is high. See Tenn. Code Ann. § 40-35-114(4).

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

In calculating the sentence for a Class B, C, D, or E felony conviction, the presumptive sentence is the minimum in the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). If there are enhancement but no mitigating factors, the trial court may set the sentence above the minimum, but still within the range. Tenn. Code Ann. § 40-35-210(d). A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210(e). The sentence must then be reduced within the range by any weight assigned to the mitigating

-11-

factors present. Id.

In this appeal, the defendant does not assert the applicability of any mitigating factors. He does argue, however, that the trial court erred by its application of enhancement factors (2), (3), (9), (10), and (16). With regard to enhancement factor (2), the defendant asserts that the evidence was insufficient to support the trial court's finding that he was a leader in the commission of an offense involving two or more criminal actors. He contends that the proof at trial showed that his "older brother exerted a bad influence over [him] and also had a prior criminal record." We disagree. In rejecting the defendant's claim that his sentences should be mitigated because he was acting under the domination of another, see Tenn. Code Ann. § 40-35-113(12), the trial court stated as follows:

> I got the impression after the hearing that he was the dominating one of this little two[-]man club that decided to rob this place. His actions were the precipitating ones, and . . . his conduct was the reason why the older man acted and went along with him.

The defendant admitted that it was his idea to rob the Pit Stop North. He arranged for the purchase of the automatic weapon used in the offenses, carried it to the convenience market, and hid it afterwards. It is our view that the evidence was sufficient to support application of the enhancement factor.

The defendant next argues that the trial court erred by applying enhancement factor (3), that the offense involved more than one victim, because "there was no proof of life[-] threatening injury to anyone." That argument, in our view, indicates that the defendant misapprehends the basis for the trial court's application of the enhancement factor. The trial court stated that the factor was applicable because "the defendant's criminal activity almost took the lives of two victims." In doing so, however, the trial court focused not on the potential danger of the defendant's conduct, but that two victims were involved in the shooting. Nevertheless, the state concedes that the trial court erred by applying this factor because the defendant was convicted separately for the attempted second degree murder of Ms. McCormick and the attempted second degree murder of Young. See State v. Freeman, 943 S.W.2d 25, 31 (Tenn. Crim. App. 1996) (holding that statutory enhancement factor for multiple victims could not be applied to defendant convicted of two counts of attempted second degree murder). Further, because the defendant did not attempt to take any property from Young, he was not a "victim" of the attempted especially aggravated robbery. See State v. Raines, 882 S.W.2d 376, 384 (Tenn. Crim. App. 1994) (holding that "victim," as contemplated by Tennessee Code Annotated section 40-35-114(3), is limited in scope to a person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime); State v. Matthew DeLoss Larsen and Andrew Lee Matthews, No. M2000-01675-CCA-R3-CD (Tenn. Crim. App., at Nashville, Oct. 12, 2001). In summary, enhancement factor (3) should not have been applied to enhance any of the defendant's sentences.

Next, the defendant asserts that the trial court erred by applying enhancement factor (9), that the defendant possessed or employed a firearm during the commission of the offense, to the

attempted especially aggravated robbery sentence. The state concedes that the factor should not have been applied. Because that factor is an essential element of the offense, it cannot be used as an enhancement factor. Especially aggravated robbery is robbery accomplished with a deadly weapon and where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a). Here, the use of a firearm in the commission of the crime was a basis for the conviction. See State v. Wilkerson, 905 S.W.2d 933, 934 (Tenn. 1995).

The state also concedes that enhancement factors (10), that the defendant had no hesitation about committing a crime where the risk to human life was high, and (16), that the crime was committed under circumstances under which the potential for bodily injury to a victim was great, should not have been applied. Because those factors are included in the essential elements of all three of the crimes for which the defendant was convicted, they should not have been applied to any of the three offenses. See State v. Jones, 883 S.W.2d 597, 602 (Tenn. 1994); State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995); see also State v. Jerry B. Crow, No. 01C01-9310-CR-00348 (Tenn. Crim. App., at Nashville, Nov. 6, 1995).

In summary, the trial court misapplied enhancement factors (3), (10), and (16). Enhancement factors (1), that the defendant has a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range, and (2), that the defendant was a leader in the commission of an offense involving two or more criminal actors, are applicable to all three of the defendant's sentences. Enhancement factor (9), that the defendant employed a firearm during the commission of the offense, is applicable to the defendant's sentences for attempted second degree murder. There are no mitigating factors applicable.

Attempted second degree murder and attempted especially aggravated robbery are both Class B felonies with Range I sentence ranges of eight to twelve years. See Tenn. Code Ann. §§ 39-12-107(a), 39-13-210(b), 39-13-403(b), 40-35-112(a)(2). In sentencing the defendant, the trial court did not assign weights to the various enhancement factors. In our view, enhancement factor (1), based solely upon the defendant's prior use of illegal drugs, should be afforded some weight. Enhancement factor (2), however, is entitled to greater weight, as the defendant initiated the commission of the offenses. Applying these two factors to the defendant's attempted especially aggravated robbery sentence, the midpoint in the range, ten years, is appropriate. Similarly, a mid-range sentence of ten years is appropriate for each of the defendant's attempted second degree murder convictions.

Finally, the defendant contends that the trial court erred by imposing consecutive sentences. Prior to the enactment of the Criminal Sentencing Reform Act of 1989, the limited classifications for the imposition of consecutive sentences were set out in Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976). In that case, our supreme court ruled that aggravating circumstances must be present before placement in any one of the classifications. Later, in State v. Taylor, 739 S.W.2d 227, 230 (Tenn. 1987), the court established an additional category for those defendants convicted of two or more statutory offenses involving sexual abuse of minors. There were, however, additional words of caution:

[C]onsecutive sentences should not routinely be imposed . . . and . . . the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved.

The Sentencing Commission Comments adopted the cautionary language. Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments. The 1989 Act is, in essence, the codification of the holdings in Gray and Taylor; consecutive sentences may be imposed in the discretion of the trial court only upon a determination that one or more of the following criteria[2] exist:

(1) The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood;
(2) the defendant is an offender whose record of criminal activity is extensive;
(3) the defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
(4) the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
(5) the defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
(6) the defendant is sentenced for an offense committed while on probation; or
(7) the defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).

The length of the sentence, when consecutive in nature, must be "justly deserved in relation to the seriousness of the offense," Tenn. Code Ann. § 40-35-102(1), and "no greater than that deserved" under the circumstances, Tenn. Code Ann. § 40-35-103(2); State v. Lane, 3 S.W.3d 456 (Tenn. 1999).

In ordering that the defendant's sentences be served consecutively, the trial court determined that the defendant was a dangerous offender:

There is no doubt . . . that this defendant Abel Torres is a dangerous offender. His behavior clearly indicates no regard whatsoever for the value of human life. There

---

[2]The first four criteria are found in Gray. A fifth category in Gray, based on a specific number of prior felony convictions, may enhance the sentence range but is no longer a listed criterion. See Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments.

-14-

was no hesitation on his part to commit crimes in which human lives were at risk. Based upon the guidelines in 40-35-115(4) Tennessee Code Annotated, and as a deterrent to those contemplating criminal activity, and this civil in nature, that is, robbing businesses with a semi-automatic weapon to attempt to kill, this defendant's sentences shall run consecutively.

In Gray, our supreme court ruled that before consecutive sentencing could be imposed upon the dangerous offender, considered the most subjective of the classifications and the most difficult to apply, other conditions must be present: (a) that the crimes involved aggravating circumstances; (b) that consecutive sentences are a necessary means to protect the public from the defendant; and (c) that the term reasonably relates to the severity of the offenses. In State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), our high court reaffirmed those principles, holding that consecutive sentences cannot be required of the dangerous offender "unless the terms reasonably relate[] to the severity of the offenses committed and are necessary in order to protect the public (society) from further criminal acts by those persons who resort to aggravated criminal conduct." The Wilkerson decision, which modified somewhat the strict factual guidelines for consecutive sentencing adopted in State v. Woods, 814 S.W.2d 378, 380 (Tenn. Crim. App. 1991), described sentencing as a "human process that neither can nor should be reduced to a set of fixed and mechanical rules." 905 S.W.2d at 938.

Here, the trial court's findings essentially track the statutory language relevant to the dangerous offender category. The trial court failed to make the requisite findings under Wilkerson to support consecutive sentencing on the grounds that the defendant is a dangerous offender. Specifically, the trial court failed to make any findings concerning the need to protect society from the defendant and the relationship of the length of the term to the severity of the offenses. Because such findings are critical to our review, this court must remand to the trial court for an appropriate analysis.

Accordingly, the judgments of conviction are affirmed. The defendant's sentences are modified to ten years for each conviction. The cause is remanded to the trial court for further consideration on the issue of consecutive sentencing.

_____
GARY R. WADE, PRESIDING JUDGE